TERRY ROSS, CASB No. 58171
terry.ross@kyl.com
AUDETTE PAUL MORALES, CASB No. 216631
audette.morales@kyl.com
KEESAL, YOUNG & LOGAN
A Professional Corporation
400 Oceangate, P.O. Box 1730
Long Beach, California 90801-1730
Telephone: (562) 436-2000
Facsimile: (562) 436-7416

Attorneys for Defendants
WACHOVIA SECURITIES, LLC and MARK WIELAND

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| VIOLETTA ETTARE,<br>Plaintiff,<br>vs.<br>JOSEPH E. BARATTA, an individual, TBIG FINANCIAL SERVICES, INC., form of business unknown, WACHOVIA SECURITIES, LLC, a Delaware Limited Liability Company, MARK WIELAND, an individual, and DOES 1-25,<br>Defendants. | Case No.: C-07-4429-JW (PVT)<br><br>**DECLARATION OF MARK WIELAND IN SUPPORT OF DEFENDANTS WACHOVIA SECURITIES, LLC AND MARK WIELAND'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br>Date: Monday, May 5, 2008<br>Time: 9:00 a.m.<br>Place: Courtroom 8, 4th Floor |

I, MARK WIELAND, declare as follows:

1. I am currently employed as a Financial Advisor for Morgan Stanley DW, Inc. ("MSDW") in West Conshohocken, Pennsylvania, and have been since March 2007. I have personal knowledge of the matters stated herein and if called, I could and would competently testify thereto.

2. Before becoming employed with MSDW, I was employed at First Union Securities and Wachovia Securities, LLC (collectively, "Wachovia").

3. During my employment at Wachovia, Plaintiff Dr. VIOLETTA ETTARE ("Plaintiff" or "Dr. Ettare") opened an investment account (account number 3033-5595), for which I was the broker of record.

4. In order to open investment accounts at Wachovia and its predecessor firm, First Union Securities, clients must review and execute certain new account documentation.

5. As was my normal course of business, I requested my assistant send Dr. Ettare the appropriate new account documentation in order to open her account. I am informed and believe my assistant sent Dr. Ettare the Wachovia new account documentation necessary to open her Wachovia account.

6. I am informed and believe that Dr. Ettare completed and returned the appropriate new account documentation required to open her Wachovia account.

7. I am informed and believe that the signed new account documents, true and correct copies of which are attached hereto as Exhibit "A," are those executed and returned to Wachovia by Dr. Ettare.

8. I have reviewed the signatures appearing on the new account documents attached hereto as Exhibit "A" and recognize those signatures to be the signature of Dr. Ettare.

Executed this 5 th day of March, 2008 at West Conshohocken PA
_______________.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[signature]
MARK WIELAND

Account Application (Individual)

☒ Individual
☐ Tenants in Common*
☐ Joint Tenants with Rights of Survivorship
☐ Joint Tenants — Community Property (if permitted by your State Laws)
☐ Custodian/Minor
☐ Guardian (appointment must be attached)
☐ Tenants by Entirety (if permitted by your State Laws)
☐ Sole Proprietorship
☐ IRA (NOT available for CAP Account)

IF TWO OR MORE OWNERS, JOINT TENANTS WITH RIGHTS OF SURVIVORSHIP WILL BE SELECTED AUTOMATICALLY IF YOU FAIL TO SELECT ONE OF THE ABOVE.

## Account Information

Name (Primary) ☐ Mr. ☐ Mrs. ☐ Ms. Marital Status: ☐ Single ☐ Married ☐ Divorced ☒ Widowed ☐ Separated ______ # of Dependents

VIOletHA EHARC

S.S.N. or Tax ID: 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 Date of Birth: 2/21/1950

Name ______ S.S.N. or Tax ID ______ Date of Birth / /

Name ______ S.S.N. or Tax ID ______ Date of Birth / /

Address: 225 Foxhollow Circle City: Morgan hill State: CA Zip: 95037

Address (LEGAL RESIDENCE — if mailing address above is a P.O. Box or different from Home address. NOTE: P.O. Box is not a legal address)

Home Phone (Primary Owner): 408 778 7833 Business Phone (Primary Owner): (408) 782 1200 Fax #: ( ) - Other Phone: ( ) - Email Address:

Citizenship: ☒ U.S. Citizen ☐ Resident Alien ☐ Non-Resident Alien (Country: ______ Prov: ______ )

Is client or client's spouse an employee or related to an employee of FUS? ☐ No ☐ Yes (if yes, complete section 1 of attached form).
Is client's employer or spouse's employer a Registered Broker Dealer, Bank, Insurance Co. or Investment Advisor? ☐ No ☐ Yes (if yes, complete section 2 of attached form)
Is client or a member of client's immediate family a director, policy-making officer, or 10% stockholder in any publicly traded company?
☐ No ☐ Yes (indicate company ______ ) (if yes, complete section 3 of attached form)

CLASS CODE

Employer's Name*: Self Employed ☐ Current ☐ Retired
Employer's Address: Sunnyville
Title/Occupation*: Owner

Spouse's Name
Spouse's Employer & Address
Spouse's Title/Occupation*

*Please Note if "Retired" and list occupation and firm retired from

## Standing Instructions (see instruction card)

Stock Instructions CSI: G
Trade Balance Instructions: H
Dividend Instructions: C
☐ Hold Principal
Money Market Instructions: ☐ Cash ☒ Re-Invest RIN Code ______

Account Category: 001
Transaction Level: 001
Account Householding
Primary Acct#:

## Additional Account Control (requires Power of Attorney)

If Yes, type of POA: ☐ Full ☒ Limited ☐ Discretionary
Name: BIG Financial Is POA financial advisor? ☐ Yes ☒ No
If yes, did you (FA) recommend POA? ☐ Yes ☒ No
Is FA registered in client's state of domicile? ☒ Yes ☐ No
Was initial deposit made? ☒ No ☐ Yes Amount: ______ Type: ______

**Brokerage Sweep/Money Market** (please indicate your choice. The Government Securities Portfolio will be selected automatically if you do not indicate a preference.)
☐ Government Securities Portfolio ☐ California Tax-Exempt Portfolio ☒ Money-Market Portfolio ☐ Tax-Exempt Portfolio ☐ New York Tax-Exempt Portfolio

## Investment Profile (This information is mandatory. Please use combined figures (if joint account))

Investment Objectives (Check one): ☐ Income ☐ Growth ☒ Growth & Income

Risk Tolerance (Check one): ☐ Conservative ☐ Moderate ☒ Aggressive

Tax Bracket: 15 %

| Knowledge & Experience | None | Limited | Average | Extensive | Years |
|---|---|---|---|---|---|
| Stocks/Bonds | ☐ | ☐ | ☒ | ☐ | 18 |
| Mutual Funds | ☐ | ☐ | ☒ | ☐ | 18 |
| UITs | ☐ | ☐ | ☐ | ☐ | |
| Annuities | ☐ | ☐ | ☐ | ☐ | |
| Options | ☐ | ☐ | ☒ | ☐ | 10 |
| Commodities | ☐ | ☐ | ☐ | ☐ | |

| Check appropriate boxes | $0 - $49,999 (A) | $50,000 - $99,999 (B) | $100,000 - $199,999 (C) | $200,000 - $499,999 (D) | $500,000 - $999,999 (E) | $1,000,000 or more (F) |
|---|---|---|---|---|---|---|
| Annual Income (all sources) | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| Net Liquid Assets | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |
| Net Worth (excluding residence) | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ |

Do you have any accounts at other Brokerage Firms? ☐ No ☐ Yes (if so, please indicate what firm or firms):

## Margin Account - (Custodian, Guardian and IRA accounts are not eligible for Margin)

All qualified accounts are opened as margin accounts. Margin trading entails greater risk and is not suitable for all investors. If the market value of eligible securities in your account declines, you may be required to deposit more money or eligible securities in order to maintain your line of credit. By signing below, I acknowledge that I have received and read the FUS General Account Agreement and Disclosure Document and Statement of Interest Charges and Margin Account Policy documents.

☐ I/we decline margin privileges. Please open my account as a cash account only. I understand that I will not have overdraft protection.

## Tax Certification - Check the ONE box below that applies.

☒ U.S. CITIZEN or RESIDENT ALIEN: *By checking this box, I certify that I am a U.S. citizen or resident alien for tax purposes and the following IRS certification applies to me. NOTE: If you are subject to backup withholding, you must cross out statement number 2 of the following IRS certification.* **Under penalties of perjury, I certify that the following apply to the Primary Account Holder: (1) The number on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.**

☐ NON-RESIDENT ALIEN: By checking this box, I certify that I am not a U.S. citizen or resident alien for U.S. tax purposes and I will provide Form W8BEN with this application.

## ACCEPTANCE OF TERMS

In consideration of First Union Securities (FUS) accepting an account and First Clearing Corporation (FCC) carrying and extending credit on margin for me/us/I/we ("I"), by signing below, I acknowledge that I have read, understand, and agree to the terms in the FUS General Account Agreement and Disclosure which contains a pre-dispute Arbitration clause. If this account is established with margin privileges, I further acknowledge that I have read, understand, and agree to the terms of the Margin section of the FUS General Account Agreement and Disclosure and understand that my securities may be pledged, repledged, hypothecated, or rehypothecated by FUS as deemed necessary.
FIRST UNION SECURITIES, INC. AND FIRST UNION SECURITIES FINANCIAL NETWORK, INC. ARE SEPARATE BROKER-DEALER AFFILIATES OF FIRST UNION CORPORATION (EACH OF THE BROKER-DEALERS WILL BE REFERRED TO HEREINAFTER INDIVIDUALLY AS "FUS"). AS SEPARATE CORPORATIONS, NEITHER IS RESPONSIBLE FOR THE OBLIGATIONS OF THE OTHER. STOCKS, BONDS, MUTUAL FUNDS AND OTHER SECURITIES BOUGHT AND SOLD THROUGH FUS ARE NOT DEPOSITS OF ANY BANK AND ARE NOT INSURED OR OTHERWISE PROTECTED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), OR ANY OTHER GOVERNMENT AGENCY; ARE NOT AN OBLIGATION OF ANY BANK OR ANY AFFILIATE OF FUS; ARE NOT ENDORSED OR GUARANTEED BY FIRST UNION CORPORATION, FUS, OR ANY BANK AFFILIATE OF FUS; AND INVOLVE INVESTMENT RISK INCLUDING POSSIBLE LOSS OF PRINCIPAL. CD's PURCHASED THROUGH FUS ARE FDIC INSURED UP TO $100,000 IN THE EVENT OF THE FAILURE OF THE ISSUING BANK AND ARE COVERED BY SIPC IN THE EVENT OF FAILURE OF FUS. NEITHER FORM OF INSURANCE PROTECTS AGAINST DECLINES IN THE MARKET VALUE OF THE CD's TO THE EXTENT A SECONDARY TRADING MARKET EXISTS. BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE FOREGOING. I UNDERSTAND THAT THIS ACCOUNT IS GOVERNED BY THE FUS GENERAL ACCOUNT AGREEMENT AND DISCLOSURE AND/OR OTHER AGREEMENTS I HAVE WITH FUS.

## Authorized Signature(s) (The IRS does not require your consent to any provision of this document other than the certification required to avoid backup withholding)

Individuals and those authorized to establish and control accounts for individual accounts must sign. All Individuals, Joint Owners, and Fiduciaries must sign. *If the Account has authorized an Investment Advisor Plan Administrator or other third party to give trading or other instructions, please provide a copy of such authorization.

Signature 1 (Primary): [signature] Date: 11-1-7-01 * Tenants in Common Ownership ____ %
Signature 2: ______ Date: ______ * Tenants in Common Ownership ____ %
Signature 3: ______ Date: ______ * Tenants in Common Ownership ____ %

If requested, does client want us to provide name and address to an issuer in which we hold securities in street name? SEC Rule 14b-1 prohibits such issuer from using name and address for any purpose other than corporate communications. ☐ Yes ☐ No

FA Signature: Mark Wieland Br. Mgr. Signature: [signature] Date: 11-26-01

First Union Securities is the trade name under which First Union Corporation provides brokerage services through two registered broker/dealers: First Union Securities, Inc., member NYSE/SIPC, and First Union Securities Financial Network, Inc., member NASD/SIPC. Accounts carried by First Clearing Corporation, member NYSE/SIPC.

556441 (25/pkg)

FINANCIAL ADVISOR

EXHIBIT "A"



# General Account Agreement
# and
# Disclosure Document

# CLIENT AGREEMENT

## INTRODUCTION

This is your Client Agreement ("Agreement"). It is the contract that contains the terms and conditions governing your securities account ("Account") with First Union Securities, Inc. ("FUSI"), who will act as your broker, and First Clearing Corporation, ("FCC"), who will carry the account and extend credit on any margin purchases. Please read this Agreement carefully. If you are not willing to be bound by these terms and conditions, you should not apply for a securities account nor should you sign the Account Application. Your signature on the Account Application confirms that you have read, understand, and agree to the terms of this Agreement.

PLEASE NOTE THAT THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION AGREEMENT.

In consideration of FUSI and FCC accepting and carrying your Account, you hereby consent and agree to the foregoing and to the following:

## 1. DEFINITIONS

Throughout this Agreement, "you," "your," and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this Account. "We," "our," "ours," and "us" refer to FUSI and FCC, their subsidiaries and affiliates, their officers, directors, agents, and employees. FUSI and FCC are non-bank affiliates of First Union Corporation. As used herein, the term "affiliate" of FUSI means First Union Corporation and its subsidiaries and affiliates, including without limitation, FCC. Each affiliate is a separately incorporated legal entity, none of which is responsible for the obligations of the others. Where the context requires, the singular shall be the plural and the plural shall be the singular.

As set forth in the Disclosure of Clearing Agreement section incorporated herein, you understand the role and services provided by FUSI and FCC, respectively, and agree that this Agreement inures to the benefit of both firms and their affiliates as applicable.

For purposes of this Agreement, "securities and other property" means, but is not limited to, money, securities, financial instruments, and commodities of every kind and nature and related contracts and options, distributions, proceeds, products, and accessions of all property. This definition includes securities and other property currently or hereafter held, carried or maintained by us, in our possession and control, for any purpose, in and for any of your accounts now or hereafter opened, including any account in which you may have an interest.

"Available Funds" is defined as the sum of money market funds and free credit balances, plus funds receivable from settled sales and the loan value available to you on marginable securities if your Account is a margin account, minus any funds needed to pay for any open orders and any uncleared deposits. Funds deposited to your Account in the form of a personal check, cashier's check, money order, or automated clearing house transfer may not be withdrawn from your Account until said funds have been cleared by the appropriate bank, clearing house, or other financial institution.

## 2. REPRESENTATIONS BY ACCOUNT HOLDER

By signing the Account you warrant that all of the information on the Account Application was provided by you or at your discretion, that it is accurate and complete to the best of your knowledge and belief and that each of the following statements is accurate as to you and your Account: (a) you are of legal age to enter into contracts in the state of your domicile; (b) no one except those persons who have signed the Account Application has any interest in the Account unless such interest is revealed in the title of the Account; and (c) unless you advise us to the contrary, in writing, and provide us with a letter of approval from your employer, where required, you represent that you are not an employee of any exchange, or of any corporation of which any exchange owns a majority of the capital stock, or of a member of an exchange, or of a member firm or member corporation registered on any exchange or of a bank, trust company, or insurance company engaged in the business of dealing, either as a broker or as a principal, in securities, bills of exchange, acceptances or other forms of commercial paper.

You further represent that if any of the representations contained herein is or becomes materially inaccurate, you will promptly notify us in writing.

## 3. SCOPE

This Agreement shall cover individually and collectively all Accounts that you may open or reopen with us, and shall inure to the benefit of our successors and assigns (whether by merger, consolidation, or otherwise) and we may transfer any of your Accounts to our successors and assigns, and this Agreement shall be binding upon your heirs, executors, administrators, successors and assigns.

## 4. JOINT ACCOUNTS

In General. If this is a Joint Account, each signer ("Joint Owner") of this Agreement agrees that all Joint Owners are jointly and separately liable for all obligations arising under the Agreement. Each Joint Owner agrees that each other Joint Owner shall have the authority to buy, sell (including short sales) and otherwise give instructions to us regarding the Joint Account, to communicate and receive information from us concerning the Joint Account, to receive on behalf of the Joint Account securities and/or other property and to dispose of same, to make on behalf of the Joint Account agreements relating to any of the foregoing matters and to terminate or modify or waive any of the provisions of such agreements and generally to deal with us on behalf of the Joint Account, all without providing notice to the other Joint Owners.

Each Joint Owner agrees that we are authorized to follow the instructions of any other Joint Owner in every respect concerning the Joint Account and to make deliveries to any Joint Owner, or upon instructions by any Joint Owner, of any securities and/or other property in the Joint Account, and to make payments to any Joint Owner, or upon orders of any Joint Owner, of any or all monies at any time or from time to time as such Joint Owner may order and direct, even if such deliveries and/or payments shall be made to such Joint Owner personally, and not for the Joint Account. Each Joint Owner agrees to hold us and our employees and agents harmless from and indemnify the same against any losses, cause of action, damages, and expenses (including attorneys' fees) arising from or as the result of us, our employees, or agents following the instructions of any Joint Owner.

Each Joint Owner further agrees that we shall not be under any duty or obligation to inquire into the purpose or propriety of any such demand for delivery of securities or payment of monies.

Notwithstanding any of the foregoing, should we receive conflicting instructions from any two or more Joint Owners, we are authorized in our sole discretion and without liability because of fluctuating market conditions or otherwise to do any one or more of the following: (i) select which instructions to follow and which to disregard; (ii) suspend all activity in the Joint Account, and refuse to buy, sell or trade any securities and/or other property, and refuse to disburse any such securities and/or other property, except upon further written instructions signed by ALL the Joint Owners; (iii) close the Joint Account and send any and all securities and/or other property by ordinary mail to the address of record; or (iv) file an interpleader action in any appropriate court, in which event we shall be entitled to recover all costs including reasonable attorneys' fees in an amount set by the court. (You agree that filing of such an interpleader by us is an extraordinary event and will not be deemed a waiver of our right to arbitration under this Agreement.)

Each Joint Owner agrees that we may, at any time, suspend all activity in the Account pending instructions from a court of competent jurisdiction.

**Death of a Joint Owner.** You also agree that in the event of the death of any Joint Owner, the survivor or survivors will notify us immediately in writing that the Joint Owner has died. We may, before or after receiving this notice, take any actions, require any documents and inheritance or estate tax waivers, retain a portion of and/or restrict transactions in the Account if we deem

 these actions advisable in order to protect ourselves against any tax, liability, penalty, or loss. The estate of the deceased Joint Owner and the surviving Joint Owners will continue to be jointly and severally liable to us for any net debit balance or loss in the Account resulting from the completion of transactions initiated prior to our receipt of the written notice of death of the deceased Joint Owner or incurred in the liquidation or the adjustment of the Joint Owners, our, and/or any third party interests.

In the event of the death of any party to a Joint Account held by spouses as tenants by the entirety or as a Joint Account with right of survivorship, you agree that the death of either of the Joint Owners shall vest the interest of the deceased tenant with the surviving tenant, who may continue to exercise full authority over the account, subject to our set-off against the account for any amounts owed by the decedent or any surviving joint owner.

In the event of the death of any party to a Joint Account held as tenants in common, you agree that in the percentage of ownership of the Account held by each of the Joint Owners as of the close of business on the date of the death of the deceased Joint Owner (or on the next following business day if the date of death is not a business day) will be the percentage specified by the Joint Owners in the Account Application. You also agree that any taxes, costs, expenses, or other charges which become a lien against or become payable out of the Account as a result of the death of the deceased Joint Owner or through the exercise by his or her estate or representatives of any rights in the Account will, insofar as possible, be deducted from the interest in the estate of such Joint Owner.

If you designate your Account as a community property account, you agree that we will treat all property placed in the Account and any proceeds generated by the property in the Account as community property. You understand that this designation is intended only for the convenience of the parties and is not intended in any way to change the substantive status of the ownership of the property or the proceeds thereof. You further authorize us to receive into the Account any securities and/or other property delivered to it by or for either Joint Owner without delineation as to actual ownership of the property.

In any situation where we cannot determine to our satisfaction the proper distribution of securities and/or other property from a Joint Account upon the death of one owner, we may, at our sole discretion, freeze the Account indefinitely pending a resolution deemed satisfactory to us, such as (without limitation) a binding agreement among all interested parties or a final decision of an arbitrator or court having jurisdiction over the matter.

Notwithstanding the governing law provisions of Section 26 of this Agreement, which shall govern the contractual obligations of the parties under the Account, the legal ownership of your Account shall be governed by and implemented under the internal laws of your state of residence.

The authority conferred hereby shall remain in force until we receive written notice of revocation.

### 5. CUSTODIAL ACCOUNTS

If this is a custodial account, you understand that we will maintain an account established under the Uniform Gifts to Minors Act or Uniform Transfers to Minors Act for which you will act as custodial. You understand that you represent and warrant that the assets in the Account belong to the minor and all such assets will only be used by you for the benefit of the minor. You further understand that only one custodian is permitted to be named on the Account and that margin is not allowed in custodial accounts. As used herein, "you" or "your" shall refer to the custodian or to the minor as the context may require.

### 6. THE ACCOUNT

The Account is a cash and/or margin brokerage securities account that may be used to purchase or sell securities and/or other property.

All orders authorized by you for the purchase or sale of securities and/or other property, which may be listed on more than one exchange or market, may be executed on any exchange or market selected by us, unless otherwise specifically directed by you.

If we provide recommendations, you recognize that these recommendations are merely opinions because such suggestions deal with future developments that cannot be predicted with certainty. We are under no obligation to keep you informed about developments in the market concerning securities and/or other property, and you will be responsible for remaining informed as to those securities and/or other property.

**Purchases of Securities.** To process orders to purchase securities and/or other property, we require that your Account contain available funds equal to or greater than the purchase price of the securities and/or other property prior to the placement of an order. We may, in our full discretion, accept an order without sufficient funds in your Account with the understanding that payment will be submitted promptly. Any order inadvertently accepted and/or executed without sufficient funds in the Account will be subject, at our discretion, to cancellation or liquidation. If full funds are not available in the Account and an order is processed, your payment via wire or personal check, cashier's check or money order must be promptly submitted to us to assure that such payment will be received by settlement date or, as market conditions warrant, your Account may be liquidated without prior notice to you.

**Sales of Securities.** You agree that you will not enter sell orders (except orders to sell "short" which are so designated by you and discussed below) unless the security which you are selling is long and in good deliverable form in your Account on or before placement of the order. Any sell order which is inadvertently accepted by us in the absence of securities long and in good deliverable form in your Account will be subject, at our discretion, to cancellation or buy-in.

**Short Sales.** When placing with us any order to sell short, you agree to designate it as such and authorize us to mark such order as "short." You understand that execution of such a "short sale" is contingent on our affirmative determination that we have made arrangements to borrow the necessary stock or we have obtained assurances that delivery can be made by the settlement date. When placing an order to "sell short against the box," you understand that you will borrow the necessary stock to make delivery on the settlement date and that your long position in such stock will be unavailable so long as such short position remains open.

**Restrictions on Trading.** You understand and agree that we may at any time, at our sole discretion and without prior notice to you, prohibit or restrict your ability to trade securities and/or other property, or to substitute securities, in your Account.

**Impartial Lottery Allocation System.** When we hold on your behalf bonds or preferred stocks in street or bearer form which are callable, all or in part, you agree to participate in the impartial lottery allocation system of the called securities in accordance with the provisions of the rules of the New York Stock Exchange.

**Control or Restricted Securities.** Prior to placing an order in connection with any securities subject to Rule 144 or 145(d) of the Securities Act of 1933, you understand and agree that you must advise us of the status of the securities and furnish us with the necessary documents (including opinions of legal counsel, if requested) to clear legal transfer. You acknowledge that there may be delays involved with the processing of control or restricted securities, and that you will not hold us liable for any losses caused directly or indirectly by such delays. We may, in our sole discretion, require that control or restricted securities not be sold or transferred until such securities clear legal transfer.

**Order Placement.** You understand and agree that when verbally placing a trade with a Financial Advisor, either in person or via telephonic means, you agree to be bound to the verbal confirmation repeated back to you, unless you object to such verbal confirmation at the time of the order. You further understand and agree that we will not be held liable for any direct, indirect, incidental, special or consequential damages that may result from your failure to object to a verbal confirmation.

**Account Access.** You understand that you can access your Account in various ways, including, but not limited to, telephoning your Financial Advisor, visiting any of our branch offices, touch-tone telephone, or online and wireless services. You agree that in the event you experience difficulty accessing your Account through any of the foregoing methods, it is your responsibility to attempt to use an alternate access method for matters you deem important.

**Cancellation/Modification Requests.** You understand that any attempt to cancel or modify an order is merely a request to cancel or modify. All cancellation requests are accepted by us on a best efforts basis only. You understand and agree that when you place a request to cancel an order, cancellation of that order is not guaranteed.

**Corrected and Late Trade Reports.** From time to time we may receive late and/or erroneous trade reports from exchanges or market makers. You understand and agree that the status of orders which are not reported to you or which are reported as having expired, been cancelled, or been executed, may be changed in response to such late reports in order to reflect what actually occurred in the marketplace with respect to such order.

**7. RULES AND REGULATIONS**

All transactions in your Account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You agree that we shall not be liable for any loss caused directly or indirectly by our compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond our control.

**8. LIEN**

All of your securities and/or other property now or hereafter held, carried, or maintained by us in our possession and control for any purpose, in or for any Account that you have an interest, shall be subject to a lien for the discharge of any and all indebtedness or any other obligation you may have to us, and are to be held by us as security for the payment of any liability or indebtedness of yours to us in the Account. We may at any time and without giving you prior notice, use and/or transfer any or all securities and/or other property in any Account in which you have an interest, without regard to us having made any advances in connection with such securities and/or other property and without regard to the number of Accounts you may have with us. In enforcing the lien, we shall have the discretion to determine which securities and/or other property are to be sold or which contracts are to be closed.

**9. PAYMENT OF INDEBTEDNESS**

You understand and agree to pay certain commissions and fees (which are subject to change) which will be charged for the services provided by us. Without limiting the foregoing, we may charge your Account(s) with such usual and customary charges as we may determine to cover our services, or the termination of such services, including, but not limited to custody and transaction fees and commissions. You agree to satisfy, upon demand, any indebtedness, and to pay any debit balance in any Account in which you have an interest. You understand and agree that a finance charge may be charged on any debit balance in your Account in accordance with our usual custom, together with any increases in rates caused by money market conditions, and with such other charges as we may impose to cover our extra services. No Account of yours may be closed without us first receiving all securities and/or property for which the Account is short and outstanding debts which you owe to us for any reason whatsoever.

You agree to pay and shall be liable for the reasonable costs and expenses of collection of the debit balance and any unpaid deficiency in any of your Accounts with us, including, but not limited to, attorney fees incurred and payable or paid by us. You further agree to reimburse us for any actual expenses we incur to execute, cancel or amend any wire transfer payment order, or perform any related act at your request. We may charge any Account of yours for such costs and expenses without prior notice to you.

All securities and/or other property now or hereafter held, carried or maintained by us in our possession in any of your Accounts may be pledged or repledged by us from time to time, without notice to you, either separately or in common with other such securities and/or other property for any amount due in any of your Accounts, or any greater amount, and we may do so without returning to your possession or control for delivery a like amount of similar securities and/or other property.

**10. LIQUIDATION**

We shall have the right, in accordance with our general policies regarding our margin maintenance requirements, as such may be modified, amended or supplemented from time to time, or, if in our discretion we consider it necessary for our protection to require additional collateral at an earlier or later point in time than called for by said general policies, or in the event that a petition in bankruptcy or appointment of a receiver is filed by or against you, or an attachment is levied against any Account in which you have an interest, or in the event of your death, to sell any or all securities and/or other property in your Accounts with us, whether carried individually or jointly with others, to buy any and/or all securities and/or other property which may be short in any of your Accounts, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase or other notice or advertisement. Any such sales or purchases may be made at our discretion on any exchange or other market where such business is usually transacted, or at public auction or private sale, and we may be the purchaser(s) for our own account, it being understood that a prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of our right to sell or buy without demand or notice as herein provided. After deducting all costs and expenses of the purchase, buy-in and/or sale and deliveries, including, but not limited to commissions and transfer and stamp taxes, we shall apply the residue of the proceeds to the payment of any and all of your liabilities to us, and you shall remain liable for any deficiency.

No course of dealing between you and us nor any delay on our part in exercising any of our rights or remedies shall constitute a waiver thereof, and any such right or remedy may be exercised from time to time and as often as we may determine.

**11. MONEY MARKET MUTUAL FUNDS**

Should your Account include a money market fund sweep feature, you understand and agree that we are authorized, without further direction from you, to invest available free credit cash balances in your Account, from time to time in accordance with our procedures, in shares of a participating money market fund (the "Portfolio") designated by you. Such investments are commonly known as "sweeps." If you fail to choose a Portfolio, you understand and agree that we are authorized to make this choice on your behalf in our sole discretion. You further agree that if we elect not to choose a Portfolio on your behalf, your Account will not be swept and will not receive interest on any available free credit cash balances.

You acknowledge that you have been provided with and have read a current copy of the prospectus for the Portfolio, which contains a more complete description of the Portfolio and its operation. You understand that you may select another participating money market fund by providing us with prior notice or that you may terminate the use of a money market fund that is linked to your Account.

You understand and agree that shares of the Portfolio may be automatically redeemed by us at net asset value to satisfy amounts that you owe in connection with your Account, such as debit balances, or investments or deposits made for you that are later reversed.

**12. ACCOUNTHOLDER'S INTENT TO CONSUMATE TRANSACTIONS**

All orders for the purchase or sale of any securities and/or other property for you are executed with the express understanding that you intend an actual purchase or sale and that it is your intention and obligation in every case to deliver certificates or commodities to cover any and all of your sales and in the case of purchases to receive and pay for certificates or commodities and that you will do so in compliance with all applicable regulations. In case we make a short sale of any securities and other property at your direction or in case you fail to deliver to us any property which we have sold at your direction, then and in such event you authorize us, in our discretion, to buy-in (and, if you have a margin account, to borrow) any securities and other property necessary to make delivery thereof, and you hereby agree to be responsible for any loss which we may sustain thereby and any premiums which we may be required to pay thereon, and for any loss which we may sustain as a result of our buy-in of (and, if you have a margin account, by reason of our inability to borrow) such securities and other property sold.

**13. EXCHANGE RATE FLUCTUATIONS**

You understand and agree that if any transactions for your Account are effected on an exchange in which a foreign currency (non-U.S. denomination) is used, any profit or loss as a result of a fluctuation in the exchange rate will be charged or credited to your Account.

**14. AUTOMATED DEPOSITS, PAYMENTS, AND TRANSFERS**

You may arrange for direct deposits to be made to, automated payments to be made from, and funds to be transferred between, your Accounts with us. We use the terms "automated credits" or "direct deposits" to indicate deposits made directly to your Account by electronic means; the terms "automated debits" or "automated payments"

to indicate payments authorized in writing to be made from your Account by electronic means; and the term "telephone transfer" to indicate movement of funds between your authorized Accounts by use of a touch-tone telephone and personalized access codes.

Your acceptance of direct deposits, authorization of automated payments, or telephone transfer to or from your Account, is your agreement to the terms and conditions of this Agreement.

Any electronic fund transfer ("Transfer") that you make in connection with your Account, including, but without limitation, automatic deposits and payments, but excluding transactions with a bank card, will be governed by the following terms and conditions. These terms and conditions also serve as the disclosure required by the Electronic Fund Transfer Act and Regulation E in connection with Transfers.

a. **Your Liability For Unauthorized Transfers.** You could lose the entire value, including your available margin, of your Account through any unauthorized Transfer. Therefore, you should notify us at once if you believe a Transfer has occurred in your account without your permission. Notifying us as soon as possible by telephone could minimize your possible losses. If you notify us within two (2) business days after you learn of the unauthorized Transfer, you can lose no more than $50.00. If you do not notify us within two (2) business days after you learn of the unauthorized Transfer, and we can prove that you could have stopped someone from making the unauthorized Transfer if you had notified us, then you can lose as much as $500.00. Should your Account Statement show any Transfer that you did not authorize, please notify us at once. If you do not notify us within sixty (60) days after the Account Statement was mailed, you may not get back any money you lost after the sixty (60) days if we can prove that we could have stopped the unauthorized Transfer if you had notified us in time. If a good reason (such as a long trip or hospital stay) keeps you from notifying us, the time periods above may be extended. If your Account is an institutional (Corporation, Non-Profit Organization, Non-Corporate Organizations, Partnerships, Estates, Pension and Profit Sharing Plans (not including IRAs and Employee Stock Ownership Plans) and other Trusts) account, you are liable for all unauthorized Transfers up to the time at which you notify us.

b. **Telephone Number and Address for Notification in the Event of Unauthorized Transfers.** If you believe that an unauthorized Transfer has occurred in your Account, call your Financial Advisor immediately or notify FCC at the following telephone numbers or address: Call (Voice) 804-965-2342, (Facsimile) 804-965-2214 or write to First Clearing Corporation, P.O. Box 6149, Glen Allen, Virginia 23058-6149, ATTN: Money Market Department.

c. **Business Days.** Our business days are Monday through Friday, except holidays observed by the New York Stock Exchange.

d. **Types of Electronic Funds Transfers Available.** You may arrange with another party, such as your employer or a government agency, to electronically Transfer deposits directly to your authorized Account on a regular basis. You may authorize another party, such as an insurance company or mortgage company, to have payments transferred from your Account and sent directly to them on a regular basis. You may also direct funds be transferred from one of your authorized accounts to another by use of a touch-tone telephone and personalized access codes (where available). In addition to the types of transfers listed above, we periodically introduce new methods by which you may make funds transfers, such as by personal computer and or wireless devices. If the combined value of your Account is adequate, you may make any number and amount of transfers. At present, there is no minimum amount required for automatic payment. The availability of automatic deposits to your Account will be limited to free credit and money market balances less funds needed to pay for any open orders and any uncleared deposits. Any loan value available to you on marginable securities, if your Account is a margin account, will not be available for the purpose of making automated transfers.

e. **Fees.** There are currently no fees charged by us for automated transfers.

f. **Right to Receive Documentation of Transfers.** If you arrange to have direct deposits made to your Account at least once every sixty (60) days from the same person or company, you can call your Financial Advisor to verify such deposits. In addition, you will receive a periodic account statement (in accordance with Section 16) that will show all activity in your Account, including any Transfer.

g. **Stop Payment Procedures and Liability.** If you have instructed us to make regular payments out of your Account, you can stop such payments by writing or calling us at the address and telephone numbers shown in Section 14(b) above in time for us to receive your request three (3) business days or more before the payment is scheduled to be made.

If a regular payment will vary in amount, the payee needs to tell you how much the payment will be at least ten (10) days prior to when it is due.

If you instruct us to stop one of these payments three (3) business days or more before the Transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

These stop payment procedures apply to institutional accounts (as defined in Section 14(a) above) as well. However, in no event will we guarantee the effectuation of, or be liable for, any stop payment request from an institutional account. You agree (if an institution) to hold us harmless for the amount(s) of any stop payment order(s) entered by you or on your behalf, and for all costs and expenses (including attorney fees) incurred by reason of the refusal to honor said payment(s), and you further agree that if, contrary to such stop payment order(s), payment is nevertheless inadvertently made through accident or oversight, we shall not be liable. This provision shall survive the termination of your Account.

WE WILL IMPOSE A $25.00 CHARGE FOR EACH STOP PAYMENT ORDER PLACED FOR YOUR ACCOUNT.

Please note that stop payment orders will not appear on your period account statement.

h. **Error Resolution Procedures.** In case of errors or questions about your transfers, please telephone or write to us at the telephone numbers and address listed in Section 14(b) above as soon as you can if you think your Account statement is wrong, or if you need more information about a Transfer listed on the Account statement. We must hear from you no later than sixty (60) days after we send you the first statement on which the problem or error appears.

When you call, please: (1) state your name and account number; (2) describe the error or Transfer you are unsure about, and explain as clearly as you can why you believe it is in error or why you need more information; and (3) state the dollar amount of the suspected error. We will tell you the results of our investigation within twenty (20) business days after we hear from you and correct any error(s) promptly. If we need more time, however, we may take up to ninety (90) days to investigate your question. If we decide to do this, we will provisionally credit your Account within twenty (20) business days for the amount you think is in error so that you will have the use of the money during the time it takes to complete our investigation. If we ask you to put your question in writing and we do not receive it within twenty (20) business days, we may not provisionally credit your Account. If we determine there was no error, we will send you a written explanation within three (3) business days after we complete the investigation. You may ask for copies of the documents that we used in our investigation.

For any Transfer occurring outside the United States, within ten (10) business days after we receive notice of an alleged error we will either resolve the claim or provisionally credit your Account while continuing to investigate the claim. If we need more time, however, we may take up to ninety (90) days to investigate the matter.

i. **Account Information Disclosure.** From time to time, subject to any applicable financial privacy laws or other laws or regulations, we may

provide information on you and your Account.

**15. WIRE AND AUTOMATED CLEARING HOUSE TRANSFERS**

a. **Governing Rules.** From time to time, you may be a party to an automated clearinghouse ("ACH") entry or a wire transfer that may be credited or debited against your Account. You agree that all wire transfers you initiate will be subject to the terms and conditions of our wire transfer agreement then in effect with respect to the type of transfer initiated. With respect to ACH transactions which you have authorized, you agree to be bound by the National Automated Clearing House Association ("NACHA") operating rules and any local ACH operating rules then in effect. With respect to other electronic funds transfers, you agree to be bound by any rules then in effect governing the use of any system through which the funds may be transmitted including, but not limited to, Federal Reserve Board Regulation J with regard to Fedwire and the Clearing House Interbank Payments System ("CHIPS") operating rules with regard to CHIPS.

b. **Notice.** You will be notified of the receipt of any ACH entry or wire transfer in your periodic account statement, but next-day or other notice will not be provided. If you believe a transfer has not been properly credited to you, you agree to promptly notify your Financial Advisor immediately.

c. **Final Payment.** Any credit resulting from an ACH credit or other wire transfer is provisional until final payment is received by us. We reserve the right to delay or prevent withdrawal of said funds pending verification of final payment. If final payment is not received, or if your Account was credited by mistake, you agree that we may reverse the credit to your Account or that you will otherwise reimburse us if funds in your Account are not sufficient. In the event that the payment does not become final, the originator will not be deemed to have paid you the amount of the credit.

d. **Compensation.** If you are entitled to compensation for any delay or improper completion of an ACH or wire transfer as a result of an error by us, our liability will be limited to the payment of interest for a period not exceeding the lesser of sixty (60) days or the period between the date of the error and the date of the correction. Any such compensation will be paid at our discretion by either (1) adjusting your Account balance to reflect the average balances you would have had but for the error, or (2) direct payment of cash in an amount equal to interest at the average applicable federal funds rate for that period.

e. **Account Numbers.** You agree that payment for ACH or wire credit transfers may be made solely by reference to the account number of the recipient. We are not obligated to determine whether a discrepancy exists between the name and the account number shown on the transfer information.

**16. COMMUNICATIONS, CONFIRMATIONS, PERIODIC ACCOUNT STATEMENTS, CREDIT REPORTS AND INVESTIGATIONS**

You agree that communications may be sent to the mailing address on file with us, or to such other address as you may hereafter give in writing, and all communications so sent, whether by mail, electronic mail, telegraph, messenger or otherwise, shall be deemed given to you personally, whether actually received or not. You warrant that the address currently on file with us is an address where you personally receive communications.

Notices and other communications, including, but not limited to margin and maintenance calls, may also be provided to you verbally. Such notices and other communications left for you on your answering machine, voice mail, electronic mail or otherwise, shall be deemed to have been delivered to you whether actually received or not.

Transactions entered into for your Account shall be confirmed to you in writing where required by applicable law or regulation. You understand that if your Account is linked to a money market fund, we (including the Portfolio) will not send out confirmations on each occasion that shares of the Portfolio are either bought or redeemed, and if you participate in a dividend reinvestment plan, we will not send out confirmations on each occasion that shares are purchased through such plan, but your account statements will describe the transactions in the Portfolio and purchases through the dividend reinvest plan which took place during the preceding period.

You understand that we will provide you with a statement at least quarterly of all transactions in your Account during that period, and monthly in the months in which there is activity in your Account. You understand that it is your responsibility to review upon first receipt all statements and confirmations delivered to you, whether by mail or otherwise. You agree that statements and confirmations shall be conclusively deemed accurate as stated unless you notify us in writing at once, and in no event later than ten (10) days after receipt for statements and two (2) days after receipt for confirmations, that the information contained in such statement or confirmation is inaccurate. Inquiries concerning the balance and positions in your Account should be directed to FCC Client Services Department, P.O. Box 6600, Glen Allen, VA 23508. All other inquiries concerning your Account and the activities therein, should be directed to the Branch Manager for the office listed on the front of the statements and confirmations provided to you. Failure to notify us shall also preclude you from asserting at any later date that such transactions were unauthorized.

You authorize us, at our discretion, from time to time, to obtain reports and to provide information to others concerning your credit standing and your business conduct. We may request credit reporting agencies for consumer reports of your credit history. Upon your request we will inform you whether we have obtained any such credit reports and, if we have, we will inform you of the name and address of the credit reporting agency that furnished the reports. Any negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations. Under the Fair Credit Reporting Act, you have the right to notify us if you believe we have reported inaccurate information about your Account to any consumer reporting agency. Such notices should be sent in writing and include your complete name, current address, social security number, telephone number, account number, type of account, specific item or dispute, and the reason why you believe the information reported is in error. Send your notice to FCC Client Services Department, P.O. Box 6600, Glen Allen, VA 23508.

You authorize us and any of our affiliates (including, without limitation, First Union Corporation) to share such information and other confidential information we and such affiliate(s) may have about you and your accounts.

**17. ARBITRATION**

**ARBITRATION - - THE FOLLOWING INFORMATION CONCERNS ARBITRATION OF CONTROVERSIES PROVIDED FOR IN THE NEXT PARAGRAPH:**

- **ARBITRATION IS FINAL AND BINDING ON THE PARTIES.**
- **THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY.**
- **PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEED-INGS.**
- **THE ABITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ABRITATORS IS STRICTLY LIMITED.**
- **THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES IN-DUSTRY.**
- **NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO EN-FORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:**

**(I) THE CLASS CERTIFICATION IS DENIED;**

**(II) THE CLASS IS DECERTIFIED; OR**

**(III) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT.**

**SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.**

**ARBITRATION AGREEMENT: YOU AGREE THAT ANY CONTROVERSY ARISING OUT OF OUR BUSINESS OR THIS AGREEMENT SHALL BE SUBMITTED TO ARBITRATION CONDUCTED BEFORE THE NEW YORK STOCK EXCHANGE, INC. OR ANY OTHER NATIONAL SECURITIES EXCHANGE ON WHICH A TRANSACTION GIVING RISE TO THE CLAIM TOOK PLACE (AND ONLY BEFORE SUCH EXCHANGE) OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., AS YOU MAY ELECT AND IN ACCORDANCE WITH THE RULES OBTAINING THE SELECTED ORGANIZATION. ARBITRATION MUST BE COMMENCED BY SERVICE UPON THE OTHER PARTY OF A WRITTEN DEMAND FOR ARBITRATION OR A WRITTEN NOTICE OF INTENTION TO ARBITRATE, THEREIN ELECTING THE ARBITRATION TRIBUNAL. IN THE EVENT YOU DO NOT MAKE SUCH ELECTION WITHIN FIVE (5) DAYS OF SUCH DEMAND OR NOTICE, YOU AUTHORIZE US TO DO SO ON YOUR BEHALF. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE COMMONWEALTH OF VIRGINIA.**

**18. EXTRAORDINARY EVENTS**

You understand and agree that we shall not be liable for any loss caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes, failure of the mails or other communication systems, or any other conditions beyond our control. You further understand and agree that we shall not be responsible for any damages caused by equipment failure, communications line failure, unauthorized access, theft, systems failure, and other occurrences beyond our control.

**19. SEPARABILITY**

If any condition or provision of this Agreement shall be held to be invalid or unenforceable by any court, or regulatory or self-regulatory agency or body, such invalidity or unenforceability shall attach only to such condition or provision. The validity of the remaining provisions and conditions shall not be affected thereby and this Agreement shall be carried out as though such invalid or unenforceable condition or provision were not contained herein.

**20. RECORDING CONVERSATIONS AND MONITORING E-MAIL**

You understand, agree, and expressly consent to our recording of your telephone calls with us and monitoring of your electronic communications conducted with us.

**21. DISCLOSURES TO ISSUERS**

Under Rule 14b-1(c) promulgated under the Securities Exchange Act of 1934, as amended, we are required to disclose to an issuer the name, address, and position of our customers who are beneficial owners of that issuer's securities unless you object. Unless you notify us of such objection in writing, we will make such disclosures to issuers.

**22. WAIVER**

Except as specifically permitted in this Agreement, no provision of this Agreement can be, nor be deemed to be, waived, altered, modified, or amended unless agreed to in writing signed by an authorized member of our firm.

Our failure to insist at any time upon strict compliance with any term contained in this Agreement, or any delay or failure on our part to exercise any power or right given to us in this Agreement, or a continued course of such conduct on our part shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any further exercise.

**23. SUCCESSORS**

You understand and agree that this Agreement and all its terms shall be binding on your heirs, executors, administrators, personal representatives, and assigns. This Agreement will inure to the benefit of our successors, assigns, and agents. We may assign the rights and duties under this Agreement to any of our subsidiaries or affiliates without giving you notice, or to any other entity upon written notice to you.

**24. POWER OF ATTORNEY**

You agree and hereby irrevocably appoint us with full power as your true and lawful attorney-in-fact, to the full extent permitted by law, for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that we deem necessary or advisable to accomplish the purposes of this Agreement.

**25. MODIFICATION OF AGREEMENT**

You understand and agree that we may unilaterally change the terms and conditions of this Agreement at any time upon providing notice to you.

**26. CHOICE OF LAW**

This Agreement shall be deemed to have been made in the Commonwealth of Virginia and shall be construed, and the rights and liabilities of the parties determined, in accordance with the laws of the Commonwealth of Virginia.

**27. TERMINATION**

You may close your Account at any time by providing us written notice. This Agreement shall remain in effect until an authorized member of our firm acknowledges in writing the receipt of such written notice, at which time you will not be bound for any further transactions made for the Account thereafter. However, you will remain responsible for all prior transactions and for all transaction costs associated with your instructions, including commissions and related costs. Provisions regarding arbitration will survive termination of this Agreement.

**28. CONTINUITY OF AGREEMENT**

The provisions of this Agreement and the other Account Documents shall be continuous, shall cover individually and collectively all accounts which you may open or reopen with us, and shall inure to the benefit of our present organization, and any successor organization or assigns.

**29. CUMULATIVE NATURE OF RIGHTS AND REMEDIES**

You understand and agree that all rights and remedies given to us in this Agreement are cumulative and not exclusive of any other rights or remedies which we otherwise have.

**30. SUB-BROKERS AND AGENTS**

You understand and agree that we may employ sub-brokers or other agents, as our agents or as your agents, in connection with the execution of any order or the consummation of any other transaction hereunder, and we shall be responsible only for reasonable care in their selection.

You agree to indemnify us and to hold us harmless from any loss, damage or liability arising out of any transaction in which we act, directly or indirectly, as your agent, absent any willful or grossly negligent conduct.

**31. NO AGENCY**

You understand and agree that FUSI is not acting as agent of FCC and you agree that you will in no way hold any affiliate of FUSI or any officer, director, or agent thereof liable for any trading losses or other losses incurred by you. FCC is carrying your account as clearing broker pursuant to a clearing agreement with FUSI. Until receipt from you of written notice to the contrary, FCC may accept from FUSI, without inquiry or investigation, orders(s) for the purchase or sale of securities and other property on margin or otherwise, and any other instructions concerning said Account. Notices to you concerning margin requirements or other matters related to your Account usually will be sent to you through FUSI, although notice may be sent directly from FCC to you with or without duplicate notice to FUSI if market conditions or time constraints so require, or if FCC determines, in its sole discretion, that other circumstances so require.

**32. ASSIGNMENT OF RIGHTS**

You understand and agree that any rights either FUSI or FCC has under this Agreement may be exercised by either FUSI or FCC or may be assigned to the other, including, but not limited to, the right to collect any debit balance or other obligations owing in your Account and that FUSI or FCC may collect from you or enforce any other rights under this Agreement independently or jointly.

**33. EFFECT OF ATTACHMENT OR SEQUESTRATION OF ACCOUNTS**

You understand and agree that we shall not be liable for refusing to obey any orders given by or for you with respect to any Account which is or has been subject to an attachment or sequestration in any legal proceeding against you, and we shall be under no obligation to contest the validity of any such attachment or sequestration.

**34. LIABILITY**

You understand and agree that we shall not be liable in connection with the entering, execution, handling, selling or purchasing of securities or orders for your Account except for gross negligence or willful misconduct on our part.

FIRST UNION Securities

# OPTION ACCOUNT INFORMATION AND AGREEMENT

NOTE: PERSONAL DATA REQUIRED ON EACH PARTY LISTED

| FA NUMBER | ACCOUNT NUMBER |
|---|---|
| PDA4 | 3033 5595 |

Suitability Code (Internal Use Only) 6/20M/[illegible]

Client Name: Violetta Ettare

Social Security/Tax I.D. Number: 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

Address: 225 Foxhollow Circle

Home Telephone: 408-778-7833

Address:

Business Telephone: 408-782-1200

City: Morganhill

State: CA

Zip: 95037

Date of Birth: 2/7/50

Number of Dependents: 0

Marital Status: ☐ Single ☐ Married ☐ Divorced ☒ Widowed

Employer's Name (if retired, state retired): Self

Type of Business:

Employer's Address: Sunnyville CA

Position:

Spouse's Name:

Spouse's Employer:

Position:

Accounts with other Broker/Dealer (Specify)

1. 2. 3.

Source of Information: ☒ Customer ☐ Other (Specify)

## DISCRETIONARY OR THIRD-PARTY AUTHORIZATION (if applicable)

| Name | Relationship to Client | Years of Experience | Stocks | Options |
|---|---|---|---|---|
| BIG Financial | Client | 20 | 20 | 20 |

## FINANCIAL DATA

| Annual Income (employer, investments, etc.) | Spouse Income | Liquid Net Worth (cash, securities, etc.) | Total Net Worth (exclusive of residence) |
|---|---|---|---|
| 200M/499999M | | 500M/999999M | 500M/999999 |

## INVESTMENT EXPERIENCE

| | How Long Traded? | Transactions Per Year | Type of Trades (cash, margin, short) |
|---|---|---|---|
| Options | 10 | 10 | All |
| Stocks | 10 | 10 | All |
| Bonds | 10 | 10 | All |
| Commodities | | | |

## TRADING STRATEGY

☐ Income and Safety (Covered Writing and Hedging Only)

☒ Speculation or Trading (Option Buying, Spreading and Uncovered Writing)

## I WISH APPROVAL TO DO THE FOLLOWING OPTION STRATEGIES

**APPROVAL**

**Branch Manager must approve prior to first trade** — Branch Manager / Date

☐ Level 1 — Covered Call Writing

☐ Level 2 — Covered Call Writing, Buying Puts Against Long Stock Positions (Married Puts) Put Writing Against Full Deposit of Strike Price (Covered Puts)

☐ Level 3 — Level 2 Plus Option Buying, Purchasing Put/Call Warrants

☐ Level 4 — Level 3 Plus Option Spreading (American Style)

☐ Level 5 — Level 4 Plus Option Spreading (European Style), Uncovered Equity Put Writing vs. Buying Power (Not Index Options)

**Branch Manager and Compliance must approve prior to first trade** — Branch Manager / Date / Compliance / Date

☒ Level 6 — Level 5 Plus Uncovered Put Writing, Uncovered Straddles, Uncovered Call Writing (Including Index Options) — [signature] 11-26-01 [signature] 11/27/01

Mark Wieland
Financial Advisor Signature Date

[signature] 11-26-01
Branch Manager's Signature Date

**TRUST ACCOUNTS:** I certify that 'trust' agreement dated ________ permits the trading of options.

**CORPORATE ACCOUNTS:** I certify that the corporate resolution or bylaws, or partnership agreement permits the use of options trading.

I/We have read the Special Statement for Uncovered Option Writers located on the last page of this document.

I/We hereby certify that the background and financial information provided above is true, correct, and complete in all aspects, and agree to advise you by registered mail to the attention of the Compliance Department of any changes in my investment objectives, financial situation and needs insofar as such changes are material to my option transactions.

X [signature] 11-17-01
Client Signature Date

I/We acknowledge receipt of the current option risk disclosure pamphlet and represent that we have sufficient investment knowledge to invest in put and call options, and that option transactions are suitable for me/us.

**Date Option Clearing Corporation Options Risk/Disclosure Document Received: Date** 11-17-01

Further, I/We have read, understand and agree to be bound by the Options Disclosure provisions printed on the last page of this agreement. It is noted that these provisions are in addition to provisions contained in the FUSI General Account Agreement.

**I/WE ACKNOWLEDGE THAT THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 18 AND I/WE HAVE RECEIVED A COPY OF THIS AGREEMENT.**

Client Signature (If Joint) Date

First Union Securities, Inc. is a separate, non-bank affiliate of First Union Corporation. Accounts carried by First Clearing Corporation, Member New York Stock Exchange and SIPC.

0000 554150 (25/pkg)

ACCOUNT DOCUMENTATION

In consideration of First Union Securities, Inc. and First Clearing Corporation (hereinafter referred to as "FUSI") respectively opening and carrying an account or accounts for me, I hereby represent and warrant with knowledge and intent that you rely thereon that all of the information and statements contained in this agreement are true and accurate. I agree to promptly notify you of any material change in my financial situation, needs, or investment objective.

I acknowledge, agree and represent:

1. I have received and read a copy of the document entitled "Characteristics and Risks of Standardized Options." A current Options Clearing Corporation Prospectus is available from your FUSI FA upon request.

2. I understand that the purchasing or selling of options may involve a high degree of risk and speculation. When purchasing options, there is the risk that the entire premium paid (purchase price) for the option can be lost if the option is not exercised or otherwise sold. When selling (writing) options, the risk of loss can be much greater if such options are written uncovered ("naked"). In such case the risk of loss can exceed the amount of premium received.

3. I am capable of evaluating and bearing the financial risks attendant to the writing (selling) or purchasing of options. My capabilities are based on my income, net worth, experience and knowledge of security investing, my financial needs and investment objectives.

4. I fully understand that an active program of purchasing and/or selling (writing) options may involve concomitant purchases and sales of the underlying stocks to which the options relate, and that such a program may produce a high level of trading activity and commission costs.

5. I have been advised of and agree to be bound by your policies and rules and federal regulations, as they exist now and may be amended relating to trading options; particularly margin requirements and payment requirements. You may, whenever your sole discretion determines that there is danger of financial loss to you or me, request additional margin deposit, purchase or sale of additional stock, or the closing out of an option position.

6. I understand that settlement (payment date) for option trades is the business day following the purchase or sale of the option. However, you may require deposits at the time of purchase or sale.

7. I understand that there are strict rules governing the cut-off time for exercising long options. I understand and agree that it is my sole responsibility to learn and keep track of the cut-off times applicable to the options in my account.

8. I understand that all transactions in my account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearinghouse, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations, or by government restrictions, exchange or market rulings, suspensions of trading, war, or other conditions beyond your control. I agree that I, acting alone or in concert with others, will not exceed applicable position or exercise limits established by any exchange or marketplace with respect to the trading of options.

9. I understand that when transactions on my behalf are to be executed in options traded on more than one exchange, in the absence of my specific instructions, you may use discretion in selecting the market in which to enter my order.

10. In transactions involving Exchange or NASDAQ listed options I will comply with all the Rules and Regulations of said market, and The Options Clearing Corporation and FUSI, including, but not limited to, limitations on the number of options I individually, or in concert with others, may have, long or short, or may exercise.

11. It is understood that if options are purchased, it shall be my sole responsibility to sell or exercise in a proper and timely manner as set forth by The Options Clearing Corporation and FUSI. I agree that in the event less than three days remain until expirations of an option, and when you have been unable to contact me regarding any positions in my account about to expire, you then may exercise the limited discretion granted to liquidate those positions as you may see fit. This limited discretionary authority shall not require you to take any action whatsoever. In the event that you should liquidate any options positions, my account will be credited in a fair and equitable manner.

12. I understand that exercise assignment notices for option contracts are allocated among client short positions, whether covered or uncovered, pursuant to an automated procedure which randomly selects from among all client short option positions established on the day of assignment, those contracts which are subject to exercise and therefore, all short option positions are liable for assignment at any time.

13. I understand that FUSI may, from time to time, purchase or sell options and/or underlying securities for FUSI's own account that you have recommended to me.

14. Any agreement by me with you, whether previously or hereafter made applicable to any account of mine with you, shall also apply to such option transactions except to the extent which it conflicts with this agreement. In the event of a conflict, this agreement shall control and where there is no conflict, each provision or each agreement shall apply.

15. You shall not be liable in connection with the execution, handling, selling, purchasing, exercising or endorsing of puts or calls for my account, except for gross negligence or willful misconduct on your part.

16. You are under no obligation to convey to me any information relating to the underlying securities covered by an option or any securities related thereto or any information relating to the options whether such information is then or thereafter known or available.

17. It shall be my sole responsibility to exercise, in a proper and timely manner, any right or privilege or obligation of any put option, call option or other option which you may purchase, handle or carry for my accounts.

18. ARBITRATION- THE FOLLOWING INFORMATION CONCERNS ARBITRATION OF CONTROVERSIES PROVIDED FOR IN THE NEXT PARAGRAPH:

- ARBITRATION IS FINAL AND BINDING ON THE PARTIES.
- THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY.
- PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.
- THE ARBITRATOR'S AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.
- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:

(I) THE CLASS CERTIFICATION IS DENIED;
(II) THE CLASS IS DECERTIFIED; OR
(III) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT.

SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

ARBITRATION AGREEMENT: I AGREE, AND BY CARRYING OR INTRODUCING AN ACCOUNT FOR ME, YOU AGREE THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN US CONCERNING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN US, WHETHER ENTERED INTO PRIOR TO, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION. SUCH ARBITRATION WILL BE CONDUCTED BY, AND ACCORDING TO THE SECURITIES ARBITRATION RULES AND REGULATIONS THEN IN EFFECT, OF THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. OR THE ARBITRATION FACILITY PROVIDED BY THE NEW YORK STOCK EXCHANGE. EITHER OF US MAY INITIATE ARBITRATION BY FILING A WRITTEN CLAIM WITH THE NASD OR THE NEW YORK STOCK EXCHANGE. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE COMMONWEALTH OF VIRGINIA.

# Account Application

New ☐ Update ☒ | Sub Firm # 001 | Branch Code PD | FA Code PDA5 | Account Number 3033-5595

## Account Classification

**Tax Status**

☒ US Citizen ☐ US Non Individual Account ☐ Resident Alien ☐ Non Resident Alien

**Product Types**

☐ Command Asset Program ☒ Standard Brokerage

**Individual Account Registration Types (select type)**

☐ Individual
☒ Custodian/Minor**
☐ Guardian/Conservatorship (must attach appointment)
☐ Sole Proprietorship
☐ 529 Plan - Individual
☐ 529 Plan - Custodian**
☐ 403(b) Retirement Plan

☐ Joint Account (select type)
☐ Joint Tenants in Common
☐ Joint Tenants with Rights of Survivorship*
☐ Community Property (If required by your State law)
☐ Joint Tenants by Entirety (if permitted by your State law)
☐ Other:

☐ IRA (select type)
☐ Regular
☐ Simple
☐ ESA IRA
☐ Roth
☐ SEP
☐ SAR-SEP
☐ Inherited
☐ Spousal
☐ Outside IRA

* If two or more owners, Joint Tenants with Rights of survivorship will be selected automatically if you fail to select one of the above.
** Primary is the minor on a custodian account.

**Non-Personal Account Registration Types (select type)**

☐ Corporate
☐ Non-Corporate/Non-Profit
☐ Investment Club
☐ Partnership
☐ Estate (Certificate of Qualification must be attached/Affidavit of Domicile must be provided)
☐ LLC
☐ Other
☐ Qualified Plan or Profit Sharing Plan: ☐ Prototype ☐ Other
☐ Trust Trustee Type: ☐ Individual w/ SSN ☐ Non-Individual w/ TIN

Trust Date: | Number of Trustee(s):

## Primary Owner Information

Will this account have Third Party Authorization? ☒ Yes ☐ No

☐ Mr. ☐ Mrs. ☐ Ms. ☐ Dr. ☐ Rev. ☐ Senator ☐ Justice ☐ Other

**Name and Address**

Name: Violetta Ettare

Legal Address (cannot be a P.O. Box): 225 Foxhollow Circle

Country of Residence: USA | City: Morgan Hill | State: CA | Zip: 95037

Home Phone 1: 408-778-7833 | Home Phone 2:

Business Phone 1: 408-782 1200 | Business Phone 2:

Cell Phone 1: 408-314-0812 | Cell Phone 2:

Fax Number: | Other Phone:

Date of Birth: 2-7-50 | Country of Citizenship: USA

**Customer Identity Verification**

Does FA have an existing or previous relationship with this person?

☒ Y

☐ N (If "No", please complete a – e below.)

a. Govt ID Type

b. Govt ID No.

c. Date of Issue

d. Date of Expiration

e. Place of Issue

SSN/TID: 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

Is FA Registered in the Client's State of Legal Address? ☒ Y ☐ N

**Tenants In Common Ownership % (must equal 100%)**

| Name | % |
|---|---|
| Name | % |
| Name | % |

**Owner Information Details**

Source of Funds:

☒ A-Savings (From Earnings) ☐ B-Inheritance ☐ C-Business Revenue ☐ D-Donations (Trusts Only) ☐ E-Sale of Business ☐ F-Sale of Real Estate
☐ G-Sale of Asset ☐ H-Legal/Ins Settlements ☐ I-Asset Appreciation ☐ J-Other ☐ K-Associated Persons

Is this a politically exposed person or relative of a politically exposed person? ☐ Y ☐ N
(If yes, AML Checklist and Enhanced Due Diligence forms are required and Compliance approval must be obtained before submitting the account for opening.)

"Politically Exposed Person" is defined as follows:
(i) A senior official in the executive, legislative, administrative, military, or judicial branches of a foreign ("non-US") government, a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation;
(ii) A corporation, business, trust or other entity that has been formed by, or for the benefit of, any senior foreign political official;
(iii) An immediate family member of any such individual;
(iv) A "close associate" of a senior foreign political figure who is widely and publicly known (or is actually known by the relevant covered financial institution) to maintain an unusually close relationship with any such individual, including a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

**Rule 144:** Is authorized person, or member of their immediate family a director, policy-making officer, or 10% stockholder in any publicly traded company?
☐ Y ☒ N **If Yes, Indicate Ticker Symbol, Cusip or Name:**

**NASD Insider Information:** Is Client, Client's Spouse or immediate relative employed by Wachovia Securities (U or V) or another NASD Member (W or X)?
If U, V, W or X, fill out the NASD Detail section on the bottom of page 6.

☒ Customer not associated with NASD firm
☐ U - Associate of Wachovia Securities and/or dependents, family members
☐ V - Non-dependent family members of an associate of Wachovia Securities
☐ W - Employees or brokers of other security firms, their dependent accounts and accounts in which they have a financial or beneficial control or interest
☐ X - Immediate family members of employees or other security firms

Occupation/Title:

☒ A-Proprietor, Professional, Manager ☐ B-Info Tech Sys ☐ C-Craftsman, Skilled Worker ☐ D-Sales ☐ E-Admin, Clerical
☐ F-Public Service ☐ G-Personal Service Provider ☐ H-Unskilled Labor ☐ I-Education ☐ J-Clergy
☐ K-Other* ☐ L-Unemployed ☐ M-Retired ☐ N-Student ☐ P-Homemaker
*(Business Nature code is required.) (If Retired, complete questions based on retired firm.)

| Sub Firm # | Branch Code | FA Code | Account Number |
|---|---|---|---|
| 001 | PD | PDA5 | 3033-5595 |

## Owner Information Details Continued

**Business Nature**

☐ A-Agriculture ☐ B-Consumer & Business Services ☐ C-Construction ☐ D-Energy ☐ S-Estate ☐ E-Financial Services ☐ F-Government
☒ G-Healthcare ☐ H-Industrial ☐ I-Media ☐ J-Non-profit ☐ R-Other ☐ K-Personal Investment Company ☐ L-Real Estate
☐ M-Retail ☐ N-Technology ☐ O-Telecommunications ☐ P-Transportation ☐ T-Trust ☐ Q-Wholesale

Employer Name: Self
Employer Phone: 408/314-0812
Years with Employer: 10
Employer Address: 5635 W Las Positas Blvd
City: Pleasanton State: CA Zip: 94588 Country: USA
Position: owner

## Account Registration & Instructions

**Registration Title (if different from page 1)**

Mailing Address (if different from Legal Address)

City | State | Zip

Home Phone | Business Phone

Fax Number | Other Phone

Email Address | SSN/TID

**AML Compliance Field (For Corporation and Partnership Accounts Only)**

Is this customer a casino, travel agency, or money remitter? ☐ Y ☐ N
If "yes," provide TIN:
*AML Checklist and Enhanced Due Diligence forms are required and Compliance approval must be obtained before submitting the account for opening.

If requested, does Client want us to provide name and address to an issuer in which we hold securities in street name? SEC Rule 14b-1 prohibits from using name and address for any purpose other than corporate communications. ☐ Y ☒ N

**Primary Owner Demographics**

☒ Female ☐ Male ☒ Own ☐ Rent

☐ Single ☐ Married ☐ Divorced ☒ Widowed Number of Dependents

Education Level
☐ High School Graduate ☐ Post Secondary Study ☐ Two-Year Degree
☐ College Graduate ☒ Post Graduate Study ☐ Advanced Degree
☐ Other

**Investment Experience (Years)**

| Stocks | Bonds | Options | Annuities-Life Ins | UITs | Mutual Funds |
|---|---|---|---|---|---|
| 5 | 5 | 5 | 0 | 0 | 5 |

**Referral Information**

How was account acquired?
☒ Existing Customer ☐ Walk-in Customer ☐ Phone-In Customer
☐ Know Personally ☐ Print Advertisement ☐ Television Advertisement
☐ Radio Advertisement ☐ Direct Mail ☐ Phone Solicitation
☐ Specific Promotion ☐ Seminar ☐ E-commerce
☐ Other

Other Brokerage Accounts? ☐ Y ☒ N If yes, firm names

Personally met with client? ☐ Y ☒ N

Referral From: ☐ None ☐ Firm ☐ Broker ☐ Professional ☐ Other

Old Account Number:

**Suitability Data Collected Should be for the Account**
(Reference tables provided on page 4)

Initial Transaction Amount:
Estimated Value of Investments: (Table 1) E
Estimated Investment Range: (Table 2)
Annual Income - All Sources: (Table 1) D
Liquid Assets: (Table 1) E
Net Worth - Excluding Residence: (Table 1) E
Tax Bracket: ☐ 10% ☐ 15% ☐ 25% ☐ 28% ☐ 33% ☒ 35% ☐ Other

Investment Objective
☐ A - Income & Conservative
☐ B - Growth & Income + Conservative
☐ C - Growth & Moderate
☐ D - Growth & Income + Moderate
☐ E - Growth & Long Term
☐ G - Income & Moderate
☐ H - Growth & Conservative
☐ I - Income & Long Term
☐ K - Growth & Income + Long Term
☒ L - Trading & Speculation

**Standing Instructions**
☒ Margin ☐ Cash

Will this account be enabled for options trading? ☒ Y ☐ N

**Margin Account — All Qualified Accounts are Opened as Margin Accounts.**

**YOU WILL HAVE A MARGIN ACCOUNT UNLESS YOU ARE INELIGIBLE OR DECLINE BELOW.** An ineligible account is defined as: Custodian, Guardian, ERISA, IRAs, Investment Club, and Pension and Profit-Sharing accounts. **Margin trading entails greater risk and is not suitable for all investors. If the market value of eligible securities in your account declines, you may be required to deposit more money or eligible securities in order to maintain your line of credit.** By signing this Application, I acknowledge that I have received and read the Margin Disclosure Statement, the WS General Account Agreement and Disclosure and Statement of Interest Charges and Margin Account Policy documents. I understand that my securities may be pledged, repledged, hypothecated or rehypothecated by WS as deemed necessary.

☐ **I DECLINE margin privileges. Please open my account as a cash account only. I understand that I will not have overdraft protection.**

**Brokerage Cash Sweep Option** (Reference table provided on page 4)
BDS

**Money Market Dividend Distributions:**
☐ Pay out money market fund distributions
☒ Reinvest money market fund distributions

**Cash Sweep Instructions:**
☐ Sweep money market in cash only
☒ Sweep money market in cash and margin

**Stock Instructions:**
☐ Register in customer name and mail
☒ Register in street name and hold
☐ DVP

**Trade Balance Instructions:**
☐ Pay net credit balance
☐ Pay and Pay
☒ Hold all balances***

*** If the stock instructions, trade balance instructions, and/or dividend instructions are left blank, the account will default to hold stocks in street name, hold balances, and/or hold dividends.

**Client Identification Program**

Has the Broker advised the party establishing this account that information collected on parties associated with this account is subject to verification as mandated by the USA Patriot Act and outlined in our Client Identification Program? ☒ Y ☐ N

**Commission Discounts (%)**

| Stocks | Bonds | Options |
|---|---|---|
| | | |

**Dividend Standing Instructions:**
☒ Into Free Credit
☐ Semi-Weekly
☐ Monthly
☐ Credit Margin Pay Cash Semi-Weekly
☐ Credit Margin Pay Cash Monthly

**Dividend Reinvestment Instructions:**
☐ All eligible dividends will be reinvested for this account.
☒ No dividends will be reinvested for this account. Cash dividends will be paid for all new trades.
☐ Cash dividends will be paid for this account unless the security is coded for reinvest.
☐ Reinvest all new dividends for this account unless the security is coded for cash dividends.

**Principal Instructions:**
☐ Principal payment to free credit for reinvestment
☒ Process principal payments according to trade standing instructions

Display cost basis on statements? ☐ Y ☒ N

| Sub Firm # | Branch Code | FA Code | Account Number |
|---|---|---|---|
| 001 | PD | PDA5 | 3033-5595 |

**Tax Certification. Check One box below that applies.**

☐ **U.S Person or Resident Alien:** By checking this box, I certify, under penalties of perjury, that I am a U.S. person or resident alien for tax purposes and the following IRS certification applies to me. (NOTE: If you are subject to backup withholding you must cross out statement number 2 of the following IRS certification.) Under penalties of perjury, I certify that the following apply to the Primary Account Holder: (1) The number on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because: (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and (3) I am a U.S. person (including a U.S. resident alien).

☐ **Non-Resident Alien:** By checking this box, I certify that I am not a U.S. citizen or resident alien for U.S. tax purposes and I will provide Form W-8BEN, W-8ECI, W-8EXP or W-8IMY with this application.

**Acceptance of Terms**

Wachovia Securities, LLC and Wachovia Securities Financial Network, LLC are separate broker-dealer affiliates of Wachovia Corporation (each of the broker-dealers will be referred to hereinafter as "Wachovia Securities" or "WS". Accounts are carried and credit is extended by First Clearing, LLC. As separate corporations, none is responsible for the obligations of the others. Stocks, bonds, mutual funds and other securities bought and sold through WS are not deposits of any bank and are not insured or otherwise protected by the Federal Deposit Insurance Corporation ("FDIC"), or any other government agency; are not an obligation of any bank or any affiliate of WS; are not endorsed or guaranteed by Wachovia Corporation, WS, or any bank affiliate of WS; and involve investment risk including possible loss of principal. CDs purchased through WS are FDIC insured up to $100,000 in the event of the failure of the issuing bank and are covered by SIPC in the event of failure of WS. Neither form of insurance protects against declines in the market value of the CDs to the extent a secondary trading market exists. By signing this Agreement, I acknowledge that I have read and understand the foregoing. I understand that this account is governed by the WS General Account Agreement and Disclosure Document and/or other agreements I have with WS.

**Arbitration**

Arbitration Disclosures:
This Agreement contains a predispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:

- All of the parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which the claim is filed.
- Arbitration awards are generally final and binding; a party's ability to reverse or modify an arbitration award is very limited.
- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.
- The arbitrators do not have to explain the reason(s) for their award.
- The panel of arbitrators typically will include a minority of arbitrators who were or are affiliated with the securities industry.
- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.
- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:

(i) the class certification is denied; or
(ii) the class is decertified; or
(iii) the client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

Arbitration Provision:
It is agreed that all controversies or disputes which may arise between you and WSLLC (including controversies or disputes with WSLLC's clearing agent), (collectively, "us") concerning any transaction or the construction, performance or breach of this Agreement or any other agreement between us, whether entered into prior to, on, or subsequent to the date of this Agreement, including any controversy concerning whether an issue is arbitrable, shall be determined by arbitration conducted before, and only before, an arbitration panel set up by either the National Association of Securities Dealers, Inc. ("NASD") or the New York Stock Exchange, Inc. ("NYSE") in accordance with their respective arbitration procedures. Any of us may initiate arbitration by filing a written claim with the NASD or the NYSE. Any arbitration under this Agreement will be conducted pursuant to the Federal Arbitration Act and the Laws of the Commonwealth of Virginia.

**Authorized Signatures**

The IRS does not require your consent to any provision of this document other than the certification required to avoid backup withholding (signature should match social security or IRS records).
Account Control. All individuals, Joint Owners, Fiduciaries of Trusts, Estates, Pension and Profit-Sharing Plans and general partners of Partnerships and those authorized to establish and control accounts must sign. For Corporations and all other organizations, the President and Secretary (or those with equivalent titles) must sign along with any other officer(s) to give instructions on behalf of the Account. If the Account has authorized an Investment Advisor Plan Administrator or other third party to give trading or other instructions, please provide a copy of such authorization. THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE LOCATED ON PAGE 3 UNDER THE HEADER "ARBITRATION," AND BY REFERENCE, ON PAGE 1, PARAGRAPH 5 OF THE WS GENERAL ACCOUNT AGREEMENT AND DISCLOSURE DOCUMENT. THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF THIS AGREEMENT AND THE WS GENERAL ACCOUNT AGREEMENT AND DISCLOSURE DOCUMENT.

| Signature | Title If Applicable | Date |
|---|---|---|
| Signature 1 Use BLACK ink only. X [signature] | | 5/12/06 |
| Signature 2 X | | |
| Signature 3 X | | |
| Signature 4 X | | |

| Internal Use | Financial Advisor Signature | FA Code | Principal Approval Signature | Principal Rep Code | Date |
|---|---|---|---|---|---|
| | [signature] | PDA4 | [signature] | PDB8 | 6/14/06 |

Wachovia Securities is the trade name used by two separate, registered broker-dealers and non-bank affiliates of Wachovia Corporation providing certain retail securities brokerage services: Wachovia Securities, LLC, member NYSE/SIPC, and Wachovia Securities Financial Network, LLC, member NASD/SIPC. Accounts carried by First Clearing, LLC, member NYSE/SIPC.

N00000000

WFNAPP

WACHOVIA SECURITIES

# OPTION ACCOUNT INFORMATION AND AGREEMENT

Suitability Code (Internal Use Only)

NOTE: PERSONAL DATA REQUIRED ON EACH PARTY LISTED

| Sub Firm # | BR Code | FA Code | Account Number |
|---|---|---|---|
| 001 | PD | PDA5 | 3033-5595 |

Client Name: Violetta Ettare
Social Security/Tax I.D. Number: 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
Address: 225 Foxhollow Circle
Home Telephone: 408-778-7833
Address:
Business Telephone: 408-[illegible]
City: Morgan Hill
State: CA
Zip: 95037
Date of Birth: 2-7-50
Number of Dependents: 0
Marital Status: ☐ Single ☐ Married ☐ Divorced ☒ Widowed
Employer's Name (if retired, state retired): Ettore Pain Treatment Clinics
Type of Business: Health Care
Employer's Address: 5635 W. Las Positas Blvd #40 L Pleasanton CA 94588
Position: Owner
Spouse's Name:
Spouse's Employer:
Position:
Accounts with other Broker/Dealer (Specify) 1. 2. 3.
Source of Information: ☒ Customer ☐ Other (Specify)

**DISCRETIONARY OR THIRD-PARTY AUTHORIZATION** *(if applicable)*

| Name | Relationship to Client | Years of Experience | Stocks | Options |
|---|---|---|---|---|
| | | | | |

**FINANCIAL DATA**

| Annual Income (employer, investments, etc.) | Spouse Income | Liquid Net Worth (cash, securities, etc.) | Total Net Worth (exclusive of residence) |
|---|---|---|---|
| 300,000 | | 750,000 | 750,000 |

**INVESTMENT EXPERIENCE**

| | How Long Traded? | Transactions Per Year | Type of Trades (cash, margin, short) |
|---|---|---|---|
| Options | 5 yrs | 20 + | All |
| Stocks | 5 yrs | 20 + | All |
| Bonds | 5 yrs | 20 + | All |
| Commodities | 0 | 0 | 0 |

**TRADING STRATEGY**

☐ Income and Safety (Covered Writing and Hedging Only)
☒ Speculation or Trading (Option Buying, Spreading and Uncovered Writing)

**I WISH APPROVAL TO DO THE FOLLOWING OPTION STRATEGIES** — **APPROVAL**

**Branch Manager must approve prior to first trade** — Branch Manager / Date

☐ Level 1 — Covered Call Writing
☐ Level 2 — Covered Call Writing, Buying Puts Against Long Stock Positions (Married Puts) Put Writing Against Full Deposit of Strike Price (Covered Puts)
☐ Level 3 — Level 2 Plus Option Buying, Purchasing Put/Call Warrants
☐ Level 4 — Level 3 Plus Option Spreading
☐ Level 5 — Level 4 Plus Uncovered Put Writing vs. Buying Power

**Branch Manager and Compliance must approve prior to first trade** — Branch Manager / Date / Compliance / Date

☒ Level 6 — Level 5 Plus Uncovered Straddles, Uncovered Call Writing

[signature] 6/14/06 (Branch Manager / Date)

[signature] 6/14/06 — Financial Advisor's Signature / Date

[signature] 6/14/06 — Branch Manager's Signature / Date

**TRUST ACCOUNTS:** I certify that trust agreement dated ____________ permits the trading of options.

**CORPORATE ACCOUNTS:** I certify that the corporate resolution or bylaws, or partnership agreement attached permits the use of options trading.

I/We have read the Special Statement for Uncovered Option Writers located on the last page of this document.

I/We hereby certify that the background and financial information provided above is true, correct, and complete in all aspects, and agree to advise you by registered mail to the attention of the Compliance Department of any changes in my investment objectives, financial situation and needs insofar as such changes are material to my option transactions.

I/We acknowledge receipt of the current option risk disclosure pamphlet and represent that we have sufficient investment knowledge to invest in put and call options, and that option transactions are suitable for me/us.

**Date Option Clearing Corporation Options Risk/Disclosure Document Received: Date** X 6-10-06

Further, I/We have read, understand and agree to be bound by the Options Disclosure provisions printed on the last page of this agreement. It is noted that these provisions are in addition to provisions contained in the Wachovia Securities General Account Agreement and Disclosure Document.

**THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE LOCATED ON PAGE 2, PARAGRAPH 18. THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT.**

X [signature] 6/2/06
Client Signature / Date

Client Signature (If Joint) / Date

In consideration of Wachovia Securities and First Clearing, LLC (hereinafter collectively referred to as "WS" or "you") respectively opening and carrying an account or accounts for me, I hereby represent and warrant with knowledge and intent that you rely thereon that all of the information and statements contained in this agreement are true and accurate. I agree to promptly notify you of any material change in my financial situation, needs, or investment objective.

**I acknowledge, agree and represent:**

1. I have received and read a copy of the document entitled "Characteristics and Risks of Standardized Options".
2. I understand that the purchasing or selling of options may involve a high degree of risk and speculation. When purchasing options, there is the risk that the entire premium paid (purchase price) for the option can be lost if the option is not exercised or otherwise sold. When selling (writing) options, the risk of loss can be much greater if such options are written uncovered ("naked"). In such case the risk of loss can exceed the amount of premium received.
3. I am capable of evaluating and bearing the financial risks attendant to the writing (selling) or purchasing of options. My capabilities are based on my income, net worth, experience and knowledge of security investing, my financial needs and investment objectives.
4. I fully understand that an active program of purchasing and/or selling (writing) options may involve concomitant purchases and sales of the underlying stocks to which the options relate, and that such a program may produce a high level of trading activity and commission costs.
5. I have been advised of and agree to be bound by your policies and rules and federal regulations, as they exist now and may be amended relating to trading options; particularly margin requirements and payment requirements. You may, whenever your sole discretion determines that there is danger of financial loss to you or me, request additional margin deposit, purchase or sale of additional stock, or the closing out of an option position. I understand that if I exceed any applicable position or exercise limits, you are authorized in your sole discretion, and without notification, to take any and all steps you deem necessary to protect yourself (for any reason), including the right to buy and/or sell (including short or short exempt) from my account in order to bring my account into compliance with such position limits.
6. I understand that settlement (payment date) for option trades is the business day following the purchase or sale of the option. However, you may require deposits at the time of purchase or sale.
7. I understand that there are strict rules governing the cut-off time for exercising long options. I understand and agree that it is my sole responsibility to learn and keep track of the cut-off times applicable to the options in my account.
8. I understand that all transactions in my account shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearinghouse, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations, or by government restrictions, exchange or market rulings, suspensions of trading, war, or other conditions beyond your control. I agree that I, acting alone or in concert with others, will not exceed applicable position or exercise limits established by any exchange or marketplace with respect to the trading of options.
9. I understand that when transactions on my behalf are to be executed in options traded on more than one exchange, in the absence of my specific instructions, you may use discretion in selecting the market in which to enter my order.
10. In transactions involving Exchange or NASDAQ listed options I will comply with all the Rules and Regulations of said market, and The Options Clearing Corporation and you, including, but not limited to, limitations on the number of options I individually, or in concert with others, may have, long or short, or may exercise.
11. It is understood that if options are purchased, it shall be my sole responsibility to sell or exercise in a proper and timely manner as set forth by The Options Clearing Corporation and you. I agree that in the event less than three days remain until expirations of an option, and when you have been unable to contact me regarding any positions in my account about to expire, you then may exercise the limited discretion granted to liquidate those positions as you may see fit. This limited discretionary authority shall not require you to take any action whatsoever. In the event that you should liquidate any options positions, my account will be credited in a fair and equitable manner.
12. I understand that exercise assignment notices for option contracts are allocated among client short positions, whether covered or uncovered, pursuant to an automated procedure which randomly selects from among all client short options positions established as of the day of assignment those contracts which are subject to exercise. The writer of an American-style option is subject to being assigned an exercise at any time after he had written the option until the option expires. By contrast, the writer of a European-style option is subject to exercise assignment only during the exercise period.
13. I understand that you may, from time to time, purchase or sell options and/or underlying securities for your own account that you have recommended to me.
14. Any agreement by me with you, whether previously or hereafter made applicable to any account of mine with you, shall also apply to such option transactions except to the extent which it conflicts with this agreement. In the event of a conflict, this agreement shall control and where there is no conflict, each provision or each agreement shall apply.
15. You shall not be liable in connection with the execution, handling, selling, purchasing, exercising or endorsing of puts or calls for my account, except for gross negligence or willful misconduct on your part.
16. You are under no obligation to convey to me any information relating to the underlying securities covered by an option or any securities related thereto or any information relating to the options whether such information is then or thereafter known or available.
17. It shall be my sole responsibility to exercise, in a proper and timely manner, any right or privilege or obligation of any put option, call option or other option which you may purchase, handle or carry for my accounts.
18. __. **ARBITRATION.**

**Arbitration Disclosures:**

**This Agreement contains a predispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:**

- **All of the parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which the claim is filed.**
- **Arbitration awards are generally final and binding; a party's ability to reverse or modify an arbitration award is very limited.**
- **The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.**
- **The arbitrators do not have to explain the reason(s) for their award.**
- **The panel of arbitrators typically will include a minority of arbitrators who were or are affiliated with the securities industry.**
- **The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
- **The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.**

**No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until:**

**(i) the class certification is denied; or**

**(ii) the class is decertified; or**

**(iii) the client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.**

**Arbitration Provision:**

**It is agreed that all controversies or disputes which may arise between you and WSLLC including controversies or disputes with WSLLC's clearing agent (collectively, "us") concerning any transaction or the construction, performance or breach of this Agreement or any other agreement between us, whether entered into prior to, on, or subsequent to the date of this Agreement, including any controversy concerning whether an issue is arbitrable, shall be determined by arbitration conducted before, and only before, an arbitration panel set up by either the National Association of Securities Dealers, Inc. ("NASD") or the New York Stock Exchange, Inc. ("NYSE") in accordance with their respective arbitration procedures. Any of us may initiate arbitration by filing a written claim with the NASD or the NYSE. Any arbitration under this Agreement will be conducted pursuant to the Federal Arbitration Act and the Laws of the Commonwealth of Virginia.**

Client Initials